Tammy **ASHWORTH** Plaintiff

v.

**ALBERS MEDICAL, INC., a/k/a Albers Medical Distributors, Inc., Med–Pro Inc., Rite Aid of West Virginia, Inc. Pfizer, Inc., and H.D. Smith Wholesale Drug Company Defendants**

No. CIV.A. 2:05–0139.

United States District Court, S.D. West Virginia, at Charleston.

July 25, 2005.

J. Miles Morgan, R. Scott Long, Hendrickson & Long, Charleston, WV, for Plaintiff.

Cathy J. Dean, Daniel R. Zmijewski, Patricia A. Sexton, Polsinelli Shalton Welte Suelthaus, Kansas City, MO, James M. Brown, Jane E. Harkins, Trish Sexton, Brown & Levicoff, Beckley, WV, William L. Biggs, Gross & Welch, Omaha, NE, Steven B. Wiley, Webster J. Arceneaux, III, Lewis Glasser Casey & Rollins, Charleston, WV, Paul T. Farrell, Robert L. Hogan, Tamela J. White, Farrell Farrell & Farrell, Huntington, WV, Thomas A. Smart, Paul C. Llewellyn, Michelle R. Tepper, Kaye Scholer, New York, NY, Francis P. Morrissey, Shiff Hardin, Chicago, IL, Randall L. Trautwein, Lamp O'Dell Bartram Levy & Trautwein, Huntington, WV, for Defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

Pending before the court is the motion of plaintiff Tammy Ashworth, filed March 7, 2005, seeking remand of the above-captioned action to the Circuit Court of Kanawha County, West Virginia. Also pending before the court is the motion of defendant Rite Aid of West Virginia, Inc., filed February 22, 2005, seeking to dismiss the entirety of plaintiff's action against it.

### I.

A. *Consumption of Counterfeit Drugs.*

According to the allegations of her complaint, the plaintiff, a resident of West Virginia, suffers from high cholesterol for which she was prescribed the pharmaceutical drug LIPITOR™. Compl. at ¶ 11. LIPITOR™ contains the active ingredient atrovastatin calcium and is used in the treatment of cardiovascular disorders and cholesterol reduction. *Id.* at ¶ 10. According to the complaint, defendant Pfizer, Inc. ("Pifzer"), retains exclusive control of the "patents, trademarks, manufacturing, labeling, packaging, re-packaging, distribution, and sale of LIPITOR™." *Id.* at ¶ 6. On April 24, 2003, and again on May 22, 2003, plaintiff purchased, pursuant to her prescription, thirty tablets purporting to be 10 mg LIPITOR™ from a pharmacy in Big Chimney, West Virginia, operated by the defendant Rite Aid of West Virginia, Inc. ("Rite Aid"). *Id.* at ¶ 23.

On May 23, 2003, the day after her second identified purchase at Rite Aid, the United States Food and Drug Administration ("FDA") announced that the defendant Albers Medical, Inc. ("Albers"), had agreed to a voluntary recall of three lots of

90–tablet bottles of 10 mg LIPITOR™ that had been repackaged by the defendant Med–Pro, Inc. *Id.* at ¶ 12. Apparently, in response to consumer complaints, the FDA tested and found that bottles in those lots contained counterfeit tablets. As part of the announcement, Albers acknowledged that the counterfeit tablets may pose a significant health risk to consumers. *Id.* On June 3, 2003, the FDA identified additional lots repackaged by Med–Pro, Inc., as containing counterfeit tablets. *Id.* at ¶ 15. As of July 16, 2003, "approximately 200,000 bottles" had been recalled.

On June 9, 2003, the plaintiff received a form letter from Rite Aid dated May 31, 2003. In that letter, Rite Aid stated that it was notifying those customers who had purchased 10mg Lipitor™ between April 3, 2003, and May 23, 2003, of the recall. The letter further states that:

> Since it is impossible to tell through inspection whether or not the product is counterfeit, we are asking our customers who have purchased Lipitor™ 10mg between April 3, 2003, and May 23, 2003, not to take any remaining tablets and return them to Rite Aid Pharmacy for replacement.

*Id.* at ¶ 26.

Subsequent to receipt of this notification, the plaintiff had an office visit with her treating physician. Plaintiff informed her physician that she may have consumed counterfeit tablets. *Id.* at ¶ 27. Plaintiff further informed her physician that she had experienced dizziness, sluggishness and chest pains during the period of April 24 to June 9, 2003. *Id.* at ¶¶ 25 & 27. Her physician ordered blood tests which revealed plaintiff to have "dangerously high" levels of triglycerides and she was admitted to a hospital for treatment. *Id.* at ¶¶ 28–29. Plaintiff contends that "[s]he has sustained numerous and severe painful injuries including, but not limited to dan-

gerously increased Triglyceride levels, and injuries to her body as a whole." *Id.* at ¶ 31.

### B. *Chain of Distribution.*

In her complaint, plaintiff alleges that defendants Med–Pro, Inc., and Albers Medical, Inc. ("Albers"), were engaged in the business of repackaging, distributing and selling pharmaceutical products. Compl. at ¶¶ 3–4. Defendant H.D. Smith Wholesale Drug Co. ("H.D.Smith") is a national distributor of pharmaceutical products and Rite Aid is seller of pharmaceutical products in the West Virginia market. *Id.* at ¶¶ 5 & 7. Plaintiff further alleges, based upon statements of Rite Aid made apparently in separate litigation, that bottles containing counterfeit tablets were purchased by Rite Aid from H.D. Smith and that H.D. Smith had purchased the same from Albers. *Id.* at ¶¶ 17–18. Plaintiff contends that "[d]efendant Albers sold and distributed LIPITOR™ repacked and sold by Defendant Med–Pro." *Id.* at ¶ 19. Moreover, the counterfeits were "colorable imitations of genuine LIPITOR." *Id.* at ¶ 20.

In making this motion, plaintiff has appended several exhibits in support, including the affidavit of Stephen M. Holt, a Special Agent for the FDA's Office of Criminal Investigation. Pl.'s Reply at Ex. E ("Holt Aff."). His affidavit sheds some light on how counterfeit tablets may have infiltrated the market.

Holt asserts that Albers Medical Distributors, Inc., purchased 203 bottles from G & K Pharma LLC on December 9, 2002. Holt Aff. at ¶ 9. Each of the bottles contained 5,000 tablets purporting to be 10mg LIPITOR™. *Id.*

G & K Pharma LLC purchased this LIPITOR™ from Pharma Medical LLC, whose authorized agent, R.J. Garcia a/k/a

Julio Cesar Cruz, is a convicted drug trafficker.[1] *Id.* at ¶¶ 9, 12–13. The LIPITOR™ purportedly came to Pharma Medical LLC through each of two companies, Drogueria Javiness and J M Blanco, in Puerto Rico. *Id.* at ¶ 9. Although Javiness and Blanco do exist, neither company has any records concerning sales of LIPITOR™ between them or to Pharma Medical LLC. *Id.* at ¶¶ 10–11.

At the direction of Albers and Cruz, all of the bottles were shipped to Med–Pro, Inc., a pharmaceutical repackager in Lexington, Nebraska. When Med–Pro, Inc., received the 5,000–count bottles, "each of the 203 were marked and labeled as having been manufactured by Warner–Lambert, Ltd., Dublin, Ireland, and bore Lot # 04132V with an expiration date of January 2004." *Id.* at ¶ 18. Pursuant to Albers' instructions, the contents of those bottles were repackaged into 11,299 90–count bottles, all bearing lot # 04132V 6 and having an expiration date of January 2004. *Id.* All 11,299 bottles were sold to H.D. Smith, who sold those bottles in the wholesale and retail markets.[2] *Id.* at ¶ 19. Forensic tests on 90–count bottles bearing that lot number have shown that each

bottle contained tablets not manufactured by Pfizer.[3] *Id.* at ¶ 20.

The testimony of a material witness is also cited in the Holt affidavit. That witness purportedly confirms that "he/she" personally participated with Cruz in a scheme to make counterfeit LIPITOR™. *Id.* at ¶ 21. That scheme included "the purchase of punches, dies, plates, and other items which they then used to create and manufacture a tablet that appeared to be genuine Lipitor manufactured by Pfizer." *Id.*

According to the information furnished by plaintiff, including the Holt affidavit and the testimony of John Theriault,[4] the counterfeit tablets consisted in part of foreign manufactured Lipitor tablets that were illegally imported and diverted to the United States market. It also consisted of bogus Lipitor. Holt notes that every bottle tested by the FDA Forensic Laboratory in Cincinnati, Ohio, bearing lot number # 04132V 6 contained some bogus Lipitor and that the bottles bearing that lot number appeared "to contain a mixture of bogus Lipitor and illegally diverted foreign manufactured Lipitor commingled together." Holt Aff. at p. 20. Although bogus,

---

1. Cruz has separate state (1984) and federal (1995) convictions for cocaine trafficking. Pl.'s Reply at Ex. E., ¶ 13. Holt notes that Cruz was arrested in July 2003 on state and federal warrants. The federal warrant alleges that Cruz violated his supervised release. The state warrant alleges that "he conspired with Michael Carlow and others to distribute stolen, diluted, illegally diverted, and otherwise bogus pharmaceutical drugs in Florida." *Id.* The bank accounts of G & K Pharma are purportedly controlled by Carlow. *Id.* at ¶ 14. G & K Pharma is a licensed drug wholesaler in the state of Missouri. *Id.* Purportedly, Cruz brokered the deal with Albers, a Missouri company, and the drugs were funneled through G & K Pharma inasmuch as Pharma Medical LLC was not licensed to sell wholesale drugs in Missouri. *Id.* at ¶¶ 14–15.

2. It is not stated that any of these bottles were sold to Rite Aid and the court does not presume so. This information is helpful to understand both the market and the infiltration of counterfeit products.

3. The forensic tests also indicated that actual Pfizer tablets were commingled with the counterfeit tablets in the bottles. However, because the "genuine tablets" were designated for foreign markets, those tablets were also illegally being sold in the United States market.

4. John Theriault is the Vice President of Global Security at Pfizer. The plaintiff has furnished Theriault's testimony given by him before the Drug Importation Task Force on April 5, 2004. Pl.'s Resp. Pfizer's Mot. Dismiss at Ex. B.

the counterfeit Lipitor appears to have contained Lipitor's active ingredient, atrovastatin calcium. Plaintiff specifically pleads that the tablets she presumably ingested had "dubious medicinal value which did not provide any treatment for her high cholesterol." Compl. at ¶ 23.

### C. *Records Request.*

Subsequent to her injuries, plaintiff submitted a written request to Rite Aid, seeking production of records relating to her prescriptions. *Id.* at ¶ 74. In his January 27, 2004, letter to Rite Aid's legal department, plaintiff's counsel stated as follows:

> I enclose a medical release executed by Ms. LeMaster[5] relating to her medical records. I specifically want all records regarding Rite–Aid dispensing Lipitor™ to Ms. LeMaster for the year 2003–2004. Specifically, I would also like Ms. Le-Master's profile as well as, documented proof of the lot numbers and the identity of the wholesale companies, which distributed any of the Lipitor™ that Ms. LeMaster received for that year.

Pl.'s Resp. to Rite Aid's Mot Dismiss at Ex. A; *see also* Compl. at ¶ 76 (noting that plaintiff asked Rite Aid to identify the lot numbers and origin of the Lipitor sold to her). Although Rite Aid provided plaintiff with a computer summary of her prescriptions, Rite Aid did not identify the lot numbers and origin of the LIPITOR™ products sold to her and did not provide copies of her original prescriptions. Pl.'s Reply at pp. 9–12.

### D. *Complaint.*

On or about January 18, 2005, plaintiff filed a ten-count complaint in the Circuit Court of Kanawha County, West Virginia, against defendants Albers, Med–Pro, Inc.,

Pfizer, Rite Aid and H.D. Smith. Count I alleges that the defendants were engaged in the manufacture, distribution and sale of counterfeit LIPITOR™ and asserts that the counterfeits were unreasonably dangerous and defective for their intended use. It is also alleged that defendants failed to provide adequate warnings. Count II asserts that the defendants were negligent inasmuch as they failed to exercise reasonable care in manufacturing, distributing and selling LIPITOR™ to ensure that counterfeit products were not allowed to enter the market. Count III states that defendants expressly warranted that LIPITOR™ was safe and effective for the uses intended and that the counterfeits sold did not conform to such representations. Count IV contends that the counterfeits breached the implied warranties of merchantability and fitness for a particular use. Count V alleges that the defendants defrauded plaintiff inasmuch as she relied upon their representation that LIPITOR™ was safe and effective, necessarily implying that the product purchased was not counterfeit. Count VI asserts that defendants engaged in a civil conspiracy to defraud the public, including the plaintiff. Count VII states that the defendants' actions violated W. Va.Code §§ 46A–6–101, *et seq.* Count VIII asserts that Rite Aid violated W. Va.Code § 16–29–1 by failing to provide plaintiff's medical records in response to an authorized written request. Count IX asserts a claim for punitive damages and Count XI asserts a claim for intentional infliction of emotional distress against all defendants. There is no Count X.

Counts I–VII, IX & XI are brought collectively against all defendants. Count VIII is brought solely against Rite Aid.

---

**5.** According to her brief in response to Rite Aid's motion to dismiss, LeMaster was plain-

tiff's former surname. Pl.'s Resp. at p. 8.

Plaintiff seeks compensatory and punitive damages, together with attorney fees and unspecified equitable relief, as well as the following:

> (15) Disgorgement of all unjust and ill-gotten profits and gains derived by Defendants from the sale of counterfeit LIPITOR™ in the State of West Virginia, which Defendants should not be allowed to retain;

*Id.* at Ad damnum Clause.

On February 18, 2005, Pfizer removed the action, contending that this court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1441. Although conceding that Rite Aid is a West Virginia corporation, Pfizer asserts that Rite Aid has been fraudulently joined as to the collective claims and fraudulently misjoined as to the claim under W. Va.Code § 16–29–1. With respect to the collective claims, Pfizer contends that Rite Aid is immune to such claims by virtue of W. Va.Code § 30–5–12(a).[6] In the alternative, Pfizer urges that Rite Aid is a health care provider and, inasmuch as all the claims are based on health care services rendered, no claim against Rite Aid may be brought until the pre-litigation requirements set forth in § 55–7B–6 of the Medical Professional Liability Act, W. Va.Code §§ 55–7B–1, *et seq.* ("MPLA"), are met. Because Rite Aid has been fraudulently joined and misjoined, Pfizer contends the court may disregard it for purposes of determining diversity jurisdiction. Pifzer also states that, inasmuch as the plaintiff claims serious compensatory damages as well as punitive damages and disgorgement of profits received on the sale of counterfeit products in West Virginia, the amount in controversy threshold has been met.

Plaintiff seeks remand, contending that Pfizer has not met its heavy burden of showing that Rite Aid has been fraudulently joined and has not demonstrated by a preponderance of evidence that the amount in controversy exceeds $75,000. With respect to Rite Aid's joinder, plaintiff claims that W. Va.Code § 30–5–12(a) and the MPLA are inapplicable here. Plaintiff further asserts that fraudulent misjoinder is inapplicable.

## II.

Subject to limited exceptions, a defendant may transfer a case from state court to federal court if the action is one "of which the district courts of the United States have original jurisdiction." 28 U.S.C.A. § 1441(a). Removal statutes must be construed in light of the federalism concerns that animate the policy of strictly confining federal jurisdiction within the congressionally-set limits. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108–09, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). "The policy of the statute calls for its strict construction." *Healy v. Ratta,* 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934). A case must be remanded if federal jurisdiction is doubtful. *Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148, 151 (4th Cir.1994). Diversity jurisdiction is typically determined from the face of plaintiff's well-pled complaint.

The doctrine of fraudulent joinder has developed as an exception to the well-

---

**6.** By separate motions, both Pfizer, in response to the plaintiff's motion to remand, and Rite Aid, in support of its motion to dismiss, have sought leave of the court to file the same supplementary authority—namely, the June 16, 2005, unpublished memorandum order and opinion in *Thomas, et al. v. Wyeth,* et al.; Civil Action No. 5:05–0094 (S.D.W.Va.). Plaintiff has opposed Rite Aid's motion. The court, for good cause shown, grants the leave sought in those motions, one filed by Pfizer on June 29, 2005, and the other filed by Rite Aid on July 6, 2005.

pled complaint rule and allows the court to disregard the citizenship of a fraudulently joined party. In order to establish fraudulent joinder, the removing defendants must demonstrate (1) that there is no possibility that plaintiff can establish a cause of action against Rite Aid, or (2) that "there was outright fraud in the plaintiff's pleading of jurisdictional facts." *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232 (4th Cir.1993) (quoting *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir.1981)).

■ The burden of demonstrating fraudulent joinder is heavy. *Id.* The defendants must show that plaintiff cannot establish a claim against the non-diverse defendant even after resolving all issues of fact and law in the plaintiff's favor. *Id.* at 232–233 (citing *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir.1992)); *see also Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir.1999). Moreover, "[a] claim need not ultimately succeed to defeat removal; only a possibility of a right to relief need be asserted." *Marshall*, 6 F.3d at 233 (citing 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE & PROCEDURE § 3723, at 253–54 (2d ed 1987)). The standard "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P, 12(b)(6)" and, indeed, if the plaintiff demonstrates even a "glimmer of hope" for relief, the jurisdictional inquiry must end. *Hartley*, 187 F.3d at 424–26.

■ Nonetheless, a finding of fraudulent joinder is warranted when the record before the court demonstrates either that "no cause of action is stated against the non-diverse defendant, or *in fact* no cause of action exists. In other words, a joinder is fraudulent if 'there [is] no real intention to get a joint judgment, and . . . there [is] no colorable ground for so claiming.'" *AIDS Counseling & Testing Centers v.*

*Group W Television, Inc.*, 903 F.2d 1000, 1003 (4th Cir.1990) (emphasis in original).

■ Although generally jurisdiction is determined at the time of removal, the court, in ascertaining whether a defendant was fraudulently joined, is not confined solely to the pleadings but may consider evidence outside the pleadings. *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98 (5th Cir.1990); *see also Pacheco de Perez v. AT&T Company*, 139 F.3d 1368 (11th Cir. 1998) ("[t]he determination of whether a resident defendant has been fraudulently joined must be based upon the plaintiff's pleading at the time of removal, supplemented by any affidavits and deposition transcripts submitted by the parties."). The Fourth Circuit has held in the context of fraudulent joinder that "the court is not bound by the allegations of the pleadings, but may instead 'consider the entire record, and determine the basis of joinder by any means available.'" *AIDS Counseling*, 903 F.2d at 1003 (quoting *Dodd v. Fawcett Publications, Inc.*, 329 F.2d 82, 85 (10th Cir.1964)).

Here, there are no allegations of outright fraud in the pleading of jurisdictional facts. The court's inquiry thus is limited to whether plaintiff conceivably may state a claim against Rite Aid under West Virginia law based on the allegations of her complaint.

### III.

#### A. *Plaintiff's Collective Common Law and Statutory Claims.*

Plaintiff asserts collective claims against all defendants, including Rite Aid, under the common law theories of strict liability, negligence, fraud, intentional infliction of emotional distress, and conspiracy. Plaintiff also contends that the defendants in selling the counterfeit tablets violated the unfair and deceptive trade practices provi-

sions set forth in W. Va.Code §§ 46A–6–101, *et seq.*

■ Under West Virginia law, a manufacturer may be held strictly liable if it places a product that has a design or structural defect into the stream of commerce and that defect is the proximate cause of an injury. *Morningstar v. Black & Decker Manu. Co.,* 162 W.Va. 857, 253 S.E.2d 666, 682 (1979). Even if the product is safe as manufactured, a claim may still arise if the product lacks adequate warnings concerning its uses. *Id.* The purpose of imposing strict liability is "to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability." *Id.* at Syl. Pt. 3.

■ The general test for a design or structural claim "is whether the involved product is defective in the sense that it is not reasonably safe for its intended use." *Id.* at Syl. Pt. The inquiry of whether a product is reasonably safe focuses on the standards employed by a reasonably prudent manufacturer and not the standards of the particular manufacturer. *Id.* Unlike product defectiveness, "use defectiveness covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner." Syl. Pt. 2, *Ilosky v. Michelin Tire Corp.,* 172 W.Va. 435, 307 S.E.2d 603 (1983). However, "[f]or the duty to warn to exist the use of the product must be foreseeable to the manufacturer or seller." *Id.* at Syl. Pt. 3.

■ Because access to the initial manufacturer is not always available as is the case here, the West Virginia Supreme Court of Appeals recognizes under the common law that all of those in the chain of distribution, regardless of guilt, may be found liable. *Dunn v. Kanawha County Bd. Educ.,* 194 W.Va. 40, 459 S.E.2d 151, 157 (1995). This recognition furthers the "public policy that an injured party not have to bear the cost of his injuries simply because the manufacturer is out of reach." *Id.*

B. *Scope of Rite Aid's Exemption Under W. Va.Code § 30–5–12(a).*

■ Although common law strict liability would extend to Rite Aid as the ultimate dispenser of the counterfeits, Pifzer contends that § 30–5–12(a) abrogates liability. The well-established rule in West Virginia concerning legislative abrogation is as follows:

"In determining the meaning of a statute, it will be presumed, in the absence of words therein, specifically indicating the contrary, that the Legislature did not intend to innovate upon, unsettle, disregard, alter or violate ... the common law[.]" Syllabus Point 27, *Coal & Coke Ry. Co. v. Conley,* 67 W.Va. 129, 67 S.E. 613 (1910).

*Osborne v. United States,* 211 W.Va. 667, 567 S.E.2d 677, 686 (2002) (Maynard, J., dissenting); *see also* Syl Pt. 2, *Smith v. West Virginia State Bd. of Educ.,* 170 W.Va. 593, 295 S.E.2d 680 (1982) ("[o]ne of the axioms of statutory construction is that a statute will be read in context with the common law unless it clearly appears from the statute that the purpose of the statute was to change the common law.").

■ Section 30–5–12(a) is part of the statutory scheme expressly governing the licensing and regulation of pharmacists and assistant pharmacists. That section provides as follows:

(a) All persons, whether licensed pharmacists or not, shall be responsible for the quality of all drugs, chemicals and

medicines they may sell or dispense with the exception of those sold in or dispensed unchanged from the original retail package of the manufacturer, in which event the manufacturer shall be responsible.

W. Va.Code § 30–5–12(a). It is clear from the express language that the legislature intended to abrogate liability of pharmacists with respect to the quality of the drugs sold in or dispensed unchanged from the original retail package of the manufacturer.

Plaintiff counters, contending that the counterfeit drugs were not purchased from the manufacturer and thus § 30–5–12(a) is inapplicable. For purposes of § 30–5–12(a), a manufacturer is a person "engaged in the manufacture of drugs or devices." *Id.* at § 30–5–1(n). Manufacturing is defined as follows:

the production, preparation, propagation or processing of a drug or device, either directly or indirectly, by extraction from substances of natural origin or independently by means of chemical or biological synthesis and includes any packaging or repackaging of the substance(s) or labeling or relabeling of its contents and the promotion and marketing of the drugs or devices. Manufacturing also includes the preparation and promotion of commercially available products from bulk compounds for resale by pharmacies, practitioners or other persons.

*Id.* at § 30–5–1(o). The term "manufacturer" is not limited to those entities who hold the patents and produce the drug from its component parts; rather, the term "manufacturer" also encompasses those persons who cause processed drugs to be repackaged and directed to the retailer.

The exception set forth in § 30–5–12(a) expressly applies to "those [drugs, chemicals and medicines] sold in or dispensed unchanged from the original retail package of the manufacturer." *Id.* In a letter to plaintiff's counsel dated August 23, 2000, the Executive Director and General Counsel of the State of West Virginia Board of Pharmacy opined that:

if a pharmacist only counts out or measures the correct prescribed drug in the prescribed dosage from the original retail package received in bulk, stock bottles from the manufacturer and transfers that dosage unchanged to the pill bottle or container given to the consumer, then they are not liable for the quality of drugs dispensed.

*Id.*

 Where the statutory provision is " 'clear and unambiguous and plainly expresses the legislative intent,' " the court will enforce the plain meaning without resort to interpretation. *Daily Gazette Company, Inc. v. W.Va. Development Office,* 206 W.Va. 51, 521 S.E.2d 543, 551 (1999) (quoting Syl. Pt. 1, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951)). The complaint and supporting evidence proffered for the court's consideration by plaintiff establish that one or more of the defendants engaged in the process of repackaging the counterfeits and marketing the counterfeits as genuine LIPITOR™ to the retail market. Once repackaged for retail, there is no allegation that the drugs were altered or changed. Rather, the allegations indicate that Rite Aid purchased the 90–count, repackaged bulk bottles unaltered and filled the plaintiff's prescription from one of the bulk bottles without altering the contents and without knowledge of their counterfeit nature. Inasmuch as the allegations and supporting documentation at best establish that Rite Aid "dispensed" unaltered the tablets from a bulk bottle repackaged, promoted and marketed as Lipitor by one or more of the other defendants and that those tablets

were colorable imitations of genuine Lipitor tablets, the court finds that § 30–5–12(a) immunizes Rite Aid from all claims based upon the quality of the drug.

### C. The Learned Intermediary Doctrine Applied To Failure to Warn Claims Respecting Prescription Drugs.

This court has previously found in an unpublished opinion cited by Pfizer that the immunity in § 30–5–12(a) does not extend to failure to warn claims based on the sale and consumption of nonprescription drugs. (*Gregory E. Walker v. Rite Aid of West Virginia, Inc., and Bayer Corp.*, Civil Action No.: 2:02–1208 at pp. 14–15, 2003 WL 24215831). Pfizer contends that the holding in *Walker* should be confined to non-prescription drugs. Pifzer also contends that plaintiff's complaint is predicated solely upon defective product issues and does not involve a claim of inadequate warning. Plaintiff has not responded to either contention.

As noted, three broad and not necessarily mutually exclusive categories of strict liability claims have been recognized in West Virginia, as follows: "design defectiveness, structural defectiveness; and use defectiveness arising out of the lack of, or the inadequacy of, warnings, instructions and labels." *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666, 682 (1979). Whereas the nature of the defect under the first two categories focuses on whether the product is safe for its intended use, the nature of a use defectiveness claim focuses "not so much on a flawed physical condition of the product, as on its unsafeness arising out of the failure to adequately label, instruct, or warn." [7] *Id.* "Use defectiveness covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner." *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603, 609 (1983); *see also Wilkinson v. Duff*, 212 W.Va. 725, 575 S.E.2d 335 (2002) (quoting *Ilosky*).

In *Walker*, the plaintiff purchased Aleve, an over-the-counter pain medicine, from the defendants Rite Aid and Bayer Corporation. He asserted that Bayer negligently designed and manufactured Aleve and that both Bayer and Rite Aid failed to warn of the dangers of Aleve, claiming injuries proximately caused by such conduct. The court rejected plaintiff's contention that W. Va.Code § 30–5–12(a) did not apply to the sale of non-prescription drugs finding that the provision made no distinction between the quality of prescription or non-prescription drugs. Concluding that W. Va.Code § 30–5–12(a) expressly abrogated liability for product defect claims, the court noted that the provision is silent with respect to the warning labels placed on the drugs' packaging. *Id.* at p. 15. Inasmuch as the legislature could have specified that the pharmacy is relieved from all forms of product liability as opposed to relief only from liability as to the quality of the drugs sold, the court found that the provision did not immunize pharmacies from failure to warn claims in the sale of non-prescription drugs.[8]

---

**7.** The relevant inquiry under all three categories "focuses on the nature of the defective and whether the defect was the proximate cause of plaintiff's injuries." *Id.*

**8.** Pfizer has cited to *In re Baycol Products Litigation*, 2003 WL 22038708 (D.Minn. Feb.25, 2003), in support of its position that a failure to warn claim is not viable. In *Baycol*, the multi-district litigation court denied a motion to remand in a West Virginia class action finding in part that claims, including failure to warn claims, against the pharmacy defendants for the sale of the prescription drug Baycol were abrogated by § 30–5–12. Specifically, the court stated:

 The learned intermediary doctrine, which the court believes would be adopted by the West Virginia Supreme Court, protects Rite Aid from a failure to warn claim with respect to prescription drugs such as Lipitor. The learned intermediary doctrine applicable to prescription drugs is an "understandable exception" to the general rule that manufacturers must warn foreseeable end users about the dangers inherent in their products. *Walls v. Alpharma USPD, Inc.*, 887 So.2d 881, 883–84 (Ala.2004). The doctrine holds that the duty of the manufacturer to warn is owed to the prescribing physician not the ultimate consumer—the patient. *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, 220 F.Supp.2d 414, 423 (E.D.Pa. 2002). This doctrine arises from the recognition of the primary role of the patient's physician in diagnosing a particular condition or ailment and prescribing a course of treatment and from the reluctance to place a duty on a manufacturer that may interfere with the physician-patient relationship. *Happel v. Wal–Mart Stores, Inc.*, 199 Ill.2d 179, 262 Ill.Dec. 815, 766 N.E.2d 1118 (2002).

Courts have extended the doctrine to pharmacies dispensing prescription drugs. *Walls*, 887 So.2d at 886; *Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 79 P.3d 922, 929 (Utah 2003); *Cottam v. CVS Pharmacy*, 764 N.E.2d at 814, 819 (Mass. 2002); *Coyle v. Richardson–Merrell, Inc.*, 526 Pa. 208, 584 A.2d 1383 (1991). The rationale expressed for such extension includes the superior role of the physician in servicing the patient's medical needs, the burden that would be placed upon the pharmacy if it were required to collect, catalogue and disseminate literature concerning drugs and drug interactions, the chilling effect a risk averse pharmacy may have on a treatment plan if every risk were disclosed, and the role of the pharmacy in the FDA regulated drug distribution system of providing a product not bargained for in the marketplace but accessed by the end-user through a physician's prescription. *Cottam*, 764 N.E.2d at 821; *Coyle*, 526 Pa. 208, 584 A.2d 1383.

The court finds that the learned intermediary doctrine applies here. There is no allegation that Rite Aid knew or should have known that the Lipitor sold to the plaintiff was counterfeit whether by observing the tablets or the bottles in which the tablets came. There is also no allegation that Rite Aid purchased the tablets from a source known to it to sell illegitimate or bogus pharmaceuticals. Instead, plaintiff specifically alleges that the FDA issued a recall the day after her second purchase and further alleges that some of the defendants withheld from other of the defendants the fact that the tablets were counterfeit. Absent specific knowledge, the only way for Rite Aid to discharge the duty plaintiff seeks to impose is to provide blanket speculative warnings with respect to the sale of every prescription drug in its inventory. Such warnings most likely would serve to chill a patient's desire to comply with the prescribed treatment. The court finds that the learned intermedi-

even if the Court construes the Complaint as alleging a failure to warn claim against Pen–Way, the Court finds that such claim is precluded by § 30–5–12. If the legislature intended to preclude only two of the three strict liability theories recognized by the West Virginia courts through the passage of § 30–5–12, it would have explicitly included those theories in the statutory language.

However, the statutory language does not reference any particular theory of liability. *Id.* at *9. Relying on § 30–5–12(a) and the legal landscape as set forth in *In re Rezulin Products Liability Litigation*, 133 F.Supp.2d 272, 289 (S.D.N.Y.2001), the court found it "unlikely that West Virginia would recognize a failure to warn claim against a pharmacy." *Id.*

ary doctrine applies to discharge any duty of the pharmacy to warn its customer of counterfeit drugs where as here the drugs are dispensed unaltered from the purported manufacturer and absent the allegation that the pharmacy had knowledge of either the counterfeit scheme or the existence of such counterfeit drugs in the distribution system at the time of the purchase.[9]

### D. Remaining Joint Claims Against All Defendants.

Plaintiff's claims against Rite Aid sounding in negligence, warranty, fraud, conspiracy, intentional infliction of emotional distress and violations of W. Va.Code § 46A–6–101, et seq., likewise have no basis. To the extent that these claims are predicated on the quality of drugs, they are preempted by § 30–5–12(a). To the extent they could be said to be predicated upon any failure by Rite Aid to warn the plaintiff or otherwise disclose the counterfeit nature of the drugs, there is no allegation that Rite Aid knew or should have known prior to the alleged sales that drugs dispensed at its facility may have been counterfeit. Indeed, plaintiff notes at one point in her negligence count that the "defendants" were negligent for "failing to advise other defendants, the FDA, and the general public that the source of LIPITOR™ products was not Pfizer, or an authorized distributor of Pfizer." Inasmuch as Rite Aid was the defendant most removed from the interjection point of the counterfeit drugs into the distribution point, this allegation would be inconsistent with a conclusion that Rite Aid had knowledge of the counterfeit nature of the drugs.

■ With respect to plaintiff's remaining claim of fraud against Rite Aid as one of the "defendants," Rule 9(b) of the Federal Rules of Civil Procedure provides that a plaintiff must plead the elements of fraud with specificity. Fed.R.Civ.P. 9(b). Under West Virginia law, "[t]he essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.'" Syl Pt. 1, Lengyel v. Lint, 167 W.Va. 272, 280 S.E.2d 66 (1981) (citing Horton v. Tyree, 104 W.Va. 238, 242, 139 S.E. 737 (1927)). "Actual fraud is intentional, and consists of intentional deception to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." Stanley v. Sewell Coal Co., 169 W.Va. 72, 285 S.E.2d 679, 683 (1981).

■ As noted, there is no specific allegation that Rite Aid knew or should have known that the bulk bottles purchased from the other defendants contained counterfeit tablets. Moreover, plaintiff's stated allegations are inconsistent with the position that Rite Aid had such knowledge inasmuch as she alleges that the defendants did not advise each other that the tablets had been obtained from a source other than Pfizer. Further, the counterfeits are alleged to be "colorable imitations" of the genuine product, negating the prospect that Rite Aid or its employees could identify the tablets as counterfeits

---

**9.** This case is distinguishable from Fagan v. AmerisourceBergen Corp., 356 F.Supp.2d 198 (E.D.N.Y.2004), in which the court declined to dismiss a complaint against the joined pharmacy defendants based on the sale of counterfeit Epogen. Fagan does not discuss a statutory scheme similar to § 30–5–12(a). In Fagan, there were allegations that the labels on the counterfeits were facially defective and that the pharmacy had known of the counterfeiting practices for years. Id. at 213. As noted, there is no allegation here sufficient to infer prior knowledge upon Rite Aid.

through visual observation. The court concludes that plaintiff has not pled fraud as to Rite Aid with the requisite specificity.[10]

E. *Fraudulent Misjoinder of the Claim Against Rite Aid under W. Va.Code § 16–29–1.*

In addition to her claims based on the consumption of the counterfeits, plaintiff claims that Rite Aid violated W. Va.Code § 16–29–1 by failing, as that provision requires, to provide her on request with a copy of all of her pertinent medical records in its possession. Section 16–29–1, which contains exceptions not pertinent here, specifies as follows:

> Any licensed, certified or registered health care provider so licensed, certified or registered under the laws of this state shall, upon the written request of a patient, his authorized agent or authorized representative, within a reasonable time, furnish a copy, as requested, of all or a portion of the patient's record to the patient, his authorized agent or authorized representative....

W. Va.Code § 16–29–1. Although § 16–29–1 provides no guidance on what constitutes a "patient's record," the West Virginia administrative regulations governing the practice of pharmacy state that each pharmacist has the following duty:

> To make a reasonable effort to obtain, record, and maintain at least the following information at the individual pharmacy:
>
> a. The patient's name, address, telephone number, date of birth or age, and gender;
>
> b. The patient's individual history including disease states, known allergies and drug reactions, and a comprehensive list of medications and relevant devices; and
>
> c. The pharmacist's comments regarding the patient's drug therapy.

W. Va.Code St. R. § 15–1–19.13.7.

Subsection (e) of § 16–29–1 provides that:

> (e) the provisions of this article may be enforced by a patient, authorized agent or authorized representative, and any health care provider found to be in violation of this article shall pay any attorney fees and costs, including court costs incurred in the course of such enforcement.

W. Va.Code § 16–29–1, *et seq.* While it is conceded that Rite Aid provided her customer history report, plaintiff contends that the report submitted did not include copies of her original prescriptions and did not identify the lot numbers of the bulk stock bottles from which her prescriptions were filled.

Pfizer contends that this claim against Rite Aid has been fraudulently misjoined with the claims against the remaining defendants inasmuch as Rite Aid's joinder is based upon transactions and occurrences which came about subsequent to and independently from the acts ascribed to the other defendants and inasmuch further as the cause of action against Rite Aid does not involve common questions of fact or law with the collective claims.

The doctrine of fraudulent misjoinder arises from *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353 (11th Cir.1996), *abrogated on other grounds, Cohen v. Office Depot*, 204 F.3d 1069 (11th Cir.2000). This

---

**10.** The court does not reach Pfizer's alternative theory that plaintiff has no claim against Rite Aid for these counts because she did not comply the pre-litigation requirements of the MPLA. That theory, however, would appear to have no application to plaintiff's claim based on W. Va.Code § 16–29–1.

doctrine is also referred to either as fraudulent joinder or procedural misjoinder. *Ren–Dan Farms, Inc. v. Monsanto Co.,* 952 F.Supp. 370 (W.D.La.1997). In *Tapscott,* the Eleventh Circuit held that:

> Misjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action. A defendant's "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy." . . . We do not hold that mere misjoinder is fraudulent joinder, but we do agree with the district court that Appellants' attempt to join these parties is so egregious as to constitute fraudulent joinder.

*Id.* at 1360. Subsequent to *Tapscott,* the Fifth Circuit, in a brief opinion, recognized that fraudulent misjoinder might be a viable removal theory. *In re: Benjamin Moore & Company,* 309 F.3d 296 (5th Cir.2002).

What conduct may constitute fraudulent joinder has merited much debate. Indeed, a number of courts and commentators have recognized that the standard for egregiousness set forth in *Tapscott* is inherently ambiguous. *In re Bridgestone/Firestone, Inc.,* 260 F.Supp.2d 722 (S.D.Ind.2003); *Bright v. No Cuts Inc.,* 2003 WL 22434232 (E.D.La. October 27, 2003); 14B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3723 (3d ed.1998). In *Bridgestone,* the court stated:

> In *Tapscott,* the court held that "[m]isjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action." The court expressly did not hold that "mere misjoinder is fraudulent joinder," but rather held that

in that particular case the misjoinder was "so egregious as to constitute fraudulent joinder." Thus, at least under *Tapscott,* something more than "mere misjoinder" of parties may be required to find fraudulent misjoinder. Precisely what the "something more" is was not clearly established in *Tapscott* and has not been clearly established since.

260 F.Supp.2d at 728.

In *Conk v. Richards & O'Neil, LLP.,* 77 F.Supp.2d 956 (S.D.Ind.1999), the court defined procedural misjoinder to be:

> a plaintiff's purposeful attempt to defeat removal by joining together claims against two or more defendants where the presence of one would defeat removal and where in reality there is no sufficient factual nexus among the claims to satisfy the permissive joinder standard.

*Id.* The court then held:

> To address whether Conk has any claims against Leonard that are related to claims against the other defendants, the court believes the controlling standard is essentially the same that applies to fraudulent joinder. Is there a reasonable possibility that a state court would find that Conk's claims against Leonard were properly joined with his claims against the other defendants?

*Id.* The *Conk* standard has been adopted by other courts. *Reed v. American Medical Sec. Group, Inc.,* 324 F.Supp.2d 798, 804 (S.D.Miss.2004); *Jackson v. Truly,* 307 F.Supp.2d 818, 824 (N.D.Miss.2004); *In Re Diet Drugs,* 294 F.Supp.2d 667, 673–74 (E.D.Pa.2003).

Plaintiff asserts that this doctrine is only applicable when two or more plaintiffs with independent and unrelated claims against separate defendants join those claims together so as to defeat jurisdiction.[11] This

---

11. Plaintiff asserts that the issue is really joinder of claims. Wright & Miller states that:

argument is without merit. Following the rationale of *Tapscott* and *Conk*, it matters not whether there is one plaintiff or multiple plaintiffs; rather the issue is whether the joinder of the defendants is permissible or whether that joinder is asserted for the sole purpose of defeating the diverse defendant's right to removal.

▮ Plaintiff nevertheless contends Rite Aid is properly joined. Under either federal or West Virginia law, the joinder of parties is governed by Rule 19 which pertains to indispensable parties and Rule 20 relating to permissible parties. As noted, plaintiffs have not asserted a proper collective claim against Rite Aid arising from the sale of drugs. Rite Aid is thus not an indispensable party to the action.

▮ Whether plaintiff is permitted to join in this action her claim for production of medical records is governed by the standards for permissive joinder set forth in Rule 20 which provides, in relevant part, that:

> All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Fed.R.Civ.P. 20(a); *see also* W. Va. R. Civ. P. 20(a) (substantially same). It has been said of Rule 20 [12] that:

> It should be recognized that Rule 18(a) concerns only the joinder of claims that one party may have against an opponent. The rule does not deal with the joinder of parties.... Thus, it now is clear that Rule 18(a) operates independently of the provisions in Rules 13, 14, 19, and 20 prescribing standards for the joinder of parties.

6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, at § 1585.

The rule imposes two specific requisites to the joinder of parties: (1) a right to relief must be asserted out of the same transaction or occurrence; and some question of law or fact common to all the parties will arise in the action. Both of these requirements must be satisfied in order to sustain party joinder under Rule 20(a).

7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, at § 1653. "[T]he rule should be construed in light of its purpose, which 'is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.'" *Saval v. BL Ltd.,* 710 F.2d 1027, 1031 (4th Cir.1983). The test under the first prong does not require " 'absolute identity of events' " and " 'would permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding.'" *Id.* Wright & Miller suggests that this test is similar to the logical relationship test under Rule 13(a) in which "all logically related events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." 7 Wright & Miller, *supra*, at § 1653.

The second prong of Rule 20(a) requires that the claims have commonality of law or fact. Fed.R.Civ.P. 20(a); W. Va. Civ. P. 20(a). "It should be noted that Rule 20(a) does not require that every question of law or fact in the action be common among the parties; rather, the rule permits party joinder whenever there will be at least one

---

**12.** Rite Aid is not an indispensable party inasmuch as complete relief may be afforded from the remaining defendants. Moreover, the absence of Rite Aid does not impair any of the remaining parties' interests or Rite Aid's interests. Additionally, there is not a substantial risk that the parties will be subject to inconsistent or multiple obligations. Fed. R.Civ.P. 19(a).

common question of law or fact." 7 Wright & Miller, *supra*, at § 1653.

Plaintiff attempts to join a claim based on Rite Aid's alleged inadequate compliance concerning her request for production of medical records with her claims against the other diverse defendants concerning the distribution of counterfeit tablets into the chain of commerce. Even assuming plaintiff has a claim under W.Va.Code § 16–29–1, the elements of which would include a request for medical records and a refusal by the health care provider to comply with such request, that claim is legally and factually too remote to sustain joinder under either federal or West Virginia law. *Grennell v. Western Southern Life Ins. Co.*, 298 F.Supp.2d 390, 397 (S.D.W.Va. 2004) ("West Virginia rules regarding permissive joinder are substantially similar to their federal counterparts"). Indeed, the contention that the plaintiff's claim against Rite Aid is logically related to the claims against the other defendants is tenuous at best. Moreover, plaintiff's claim against Rite Aid seeking the production of medical records does not share any common questions of material fact or law with her claims against the remaining defendants.

Plaintiff's claims against the remaining defendants are predicated upon her alleged consumption of counterfeit tablets and the roles of those diverse defendants in allowing counterfeits to reach her. Plaintiff's claim against non-diverse Rite Aid concerns a written request for medical records and a purported failure on the part of Rite Aid to comply with that request. The statute does not require the plaintiff to justify her request, negating any overlapping factual issues with the diverse defendants. Furthermore, there are no common legal issues as the only duties arising under the statute concern the patient/health care provider relationship. Rite Aid's liability under the statute does not turn on any resolution of whether any of the tablets sold to and consumed by plaintiff were counterfeit. Rather, the inclusion of non-diverse Rite Aid serves to unfairly defeat the diverse defendants' right to have the action against them heard in this court. Inasmuch as there is no common factual or legal questions governing the claims, the court finds that Rite Aid is not properly joined in this action.

Although Rite Aid seeks to dismiss this claim, contending that it has provided the requisite information by forwarding to plaintiff's counsel a computer generated customer history report on the plaintiff, Rule 21 provides that:

> Misjoinder of parties is not grounds for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

Fed.R.Civ.P. 21. The appropriate course of action is to sever the plaintiff's cause of action against Rite Aid. Because the plaintiff and Rite Aid are non-diverse and there is no other basis for jurisdiction, the court does not possess subject matter jurisdiction over the severed claim and thus does not have authority to entertain the motion to dismiss.[13] Accordingly, the severed

---

**13.** Although it is conceded in the briefing on Rite Aid's motion to dismiss that the customer history report was provided, plaintiff contends that copies of her original prescriptions as well as information of the lot number of the stock bottle from which her prescriptions were filled were not provided. Inasmuch as the customer history report would presumably contain the information set forth in the prescriptions, the real dispute here concerns the provision of the lot number. Rite Aid has submitted an affidavit stating that it does not record such information. The pharmacy regulations do not list the lot number as a part of

claim should be remanded to the Circuit Court of Kanawha County, West Virginia.

### IV.

Plaintiff posits one final argument concerning subject matter jurisdiction which relates to the amount in controversy. Subject to limited exceptions, a defendant may transfer a case from state court to federal court if the action is one "of which the district courts of the United States have original jurisdiction." 28 U.S.C.A. § 1441(a). Removal statutes must be construed in light of the federalism concerns that animate the policy of strictly confining federal jurisdiction within the congressionally-set limits. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). "The policy of the statute calls for its strict construction." *Healy v. Ratta*, 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934). A case must be remanded if federal jurisdiction is doubtful. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994).

■ Federal district courts have original jurisdiction of actions between citizens of different states in which the "matter in controversy" exceeds $75,000, exclusive of interest and costs. 28 U.S.C.A. § 1332(a). A defendant who removes a case from state court in which the damages sought are unspecified, asserting the existence of federal diversity jurisdiction, must prove by a preponderance of the evidence that the value of the matter in controversy exceeds the jurisdictional amount. *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1357 (11th Cir.1996); *Gaus v. Miles, Inc.*, 980 F.2d 564, 567 (9th Cir.1992). The amount in controversy, if not specified in the complaint, must be determined on the likely monetary relief that may be granted to the plaintiffs if they succeed on all of their claims asserted in good faith. *Landmark Corp. v. Apogee Coal Co.*, 945 F.Supp. 932, 936–37 (S.D.W.Va.1996).

■ In addition to compensatory and statutory damages, punitive damages may be included for the purpose of determining the amount in controversy. 14B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, at § 3702. Of course, "claims for punitive damages proffered for the purpose of achieving the jurisdictional amount should be carefully examined." *Saval v. BL Ltd.*, 710 F.2d 1027, 1033 (4th Cir.1983). The issue of whether a plaintiff has pled in good faith a claim for punitive damages is dependent upon his state causes of action. Wright & Miller, *supra*, at § 3702.

■ Having reviewed the complaint, the court is satisfied that the amount in controversy has been met. Plaintiff seeks the following relief:

(1) Medical and hospital bills for diagnostic and preventative treatment and therapies and for treatment of injuries, both past and future;

(2) Physical injuries, both temporary and permanent;

(3) Severe and significant emotional distress, and mental pain and suffering, both temporary and permanent;

(4) Fear, humiliation, and embarrassment, past and future;

(5) Annoyance and inconvenience, past and future;

(6) Loss of physical health and well being, past and future;

---

a pharmacist's mandatory minimum. This, nevertheless, is an issue for the state court to resolve.

(7) Loss of enjoyment of life, past and present;

(8) Loss of income, past and future;

(9) Loss of value of employment benefits, including, but not limited to, loss of value of pension/retirement benefits;

(10) Disability;

(11) Loss of homemaker services, past and future;

(12) Lost consortium, past and future;

(13) Compensatory damages;

(14) Punitive damages;

(15) Disgorgement of all unjust and ill-gotten profits and gains derived by Defendants from the sale of counterfeit LIPITOR™ in the State of West Virginia, which Defendants should not be allowed to retain;

(16) Attorney's fee and costs;

(17) All statutory, common-law, and equitable relief to which the Plaintiffs may be entitled;

(18) Pre and post-judgment interest and

(19) Such other and further relief as justice requires.

Compl. at Ad damnum Clause. Plaintiff's complaint indicates that as a result of her consumption of counterfeit Lipitor she was hospitalized sustaining severe, painful and permanent injuries. She further contends that her injuries have impaired her ability to work resulting in economic damages such as lost wages. As pled, her compensatory damages alone would suggest that the amount in controversy exceeds $75,000.[14]

On top of her multiple requests for substantial compensatory relief, plaintiff seeks punitive damages based on her fraud claim. She also seeks disgorgement of profits on the defendants' sale of counterfeit Lipitor in West Virginia. Inasmuch as Lipitor is the most prescribed medicine in the United States—a fact noted by plaintiff in her complaint—the profits generated from the sale of the counterfeit tablets in West Virginia alone may have reached many thousands of dollars. Plaintiff also seeks attorney fees under § 46A–6–106 which may be added to the calculus. The court finds that the relief sought by the plaintiff is more likely than not in excess of $75,000.

## V.

For the reasons set forth, it is accordingly ORDERED that:

1. The claim of plaintiff Tammy Ashworth asserted against Rite Aid of West Virginia, Inc., pursuant to W. Va.Code § 16–29–1 be, and it hereby is, severed and remanded to the Circuit Court of Kanawha County, West Virginia;

2. To the extent defendant Rite Aid of West Virginia, Inc., has moved for dismissal of all other claims asserted herein against it, that motion be, and it hereby is, granted.

---

**14.** On June 13, 2005, Pfizer filed a motion for leave to file a supplemental response to the motion to remand, seeking to draw the court's attention to a May 25, 2005, letter from plaintiff's counsel to counsel for Albers. The motion is granted and that supplemental response is deemed filed as of June 15, 2005—the date that the letter was provided to the court.

In that letter, plaintiff communicates a $150,000 demand for settlement of all her claims against Albers. Given the amount of that demand and the confinement of that demand to a single defendant, one would be hard pressed to conclude that at the time of removal plaintiff was not seeking relief in excess of $75,000. Although this correspondence did not exist at the time of the removal, it certainly does nothing to detract from the conclusion that the amount in controversy exceeds $75,000.

3. The defendant Rite Aid of West Virginia, Inc., be, and it hereby is, stricken as a party defendant in this action; and

4. The motion of plaintiff Tammy Ashworth seeking to remand her claims against the remaining non-diverse defendants be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion to all counsel of record.